**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MEGAN CHANTEL BLANKENSHIP,**

      **Plaintiff,**

v.                                    **Case No.: 3:16-cv-00094**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

      **Defendant.**

**<u>MEMORANDUM OPINION</u>**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the court **FINDS** that the decision of the Commissioner is not supported by substantial evidence and, therefore, should be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

**I.**   **<u>Procedural History</u>**

      Plaintiff, Megan Chantel Blankenship (hereinafter referred to as "Claimant"),

completed an application for SSI on September 21, 2012, alleging a disability onset date of January 10, 2010, due to "Peptic ulcer disease, add [Attention Deficit Disorder, "ADD"], adhd, [Attention Deficit Hyperactivity Disorder, "ADHD"], bipolar, asthma, panic attack, clinical depression, back pain, migraines, asthma [and] arthritis." (Tr. at 171, 208). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 91-96, 102-105). On April 16, 2013, Claimant filed a written request for an administrative hearing, which was held on June 6, 2014 before the Honorable Paul Gaughen, Administrative Law Judge ("ALJ"). (Tr. at 29-64). By written decision dated August 19, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-24). The ALJ's decision became the final decision of the Commissioner on November 24, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On January 6, 2016, Claimant timely brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and Transcript of the Proceedings on March 16, 2016. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 18 years old on the disability onset date and 21 years old at the time of the ALJ's decision. (Tr. at 34). She completed the tenth grade, (Tr. at 35, 209), and could read and write in English. (Tr. at 207). Claimant's past relevant work included short stints as a cashier at a fast food restaurant and a dietary aide in a nursing home. (Tr. at 23, 199).

### III.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical

and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique" at every level in the administrative process, including review by an ALJ. 20 C.F.R. § 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the ALJ documents the pertinent findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a

severe mental impairment, which neither meets nor equals a listed mental disorder, the

SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation

further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and
> laboratory findings, the functional limitations that were considered in
> reaching a conclusion about the severity of the mental impairment(s). The
> decision must include a specific finding as to the degree of limitation in each
> functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she

had not engaged in substantial gainful activity since the date of her application for

benefits. (Tr. at 14, Finding No. 1). Under the second inquiry, the ALJ found that Claimant

suffered from the severe impairments of affective disorder; anxiety disorder, not

otherwise specified ("NOS"); and asthma. (Tr. at 14 Finding No. 2). At the third inquiry,

the ALJ concluded that Claimant's impairments did not meet or equal the level of severity

of any impairment contained in the Listing. (Tr. at 14-16, Finding No. 3). Consequently,

the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 416.967(b) such that the claimant
> would need a sit and stand alternating option, with an inability to keep up
> with fast-paced productions demands, such as rigid hourly quotas. She
> cannot work around unprotected heights, industrial equipment,
> temperature extremes, or extremes of humidity. The claimant cannot climb
> ladders or walk across uneven ground. She can stand or walk short distances
> for a total of 4 to 4 ½ hours, and 1 hour at a time, and the balance of an 8-
> hour workday can be performed seated doing basic work activities. The
> claimant's capacity to work seated is not limited, as she can work an entire
> 8-hour workday seated. She can occasionally lift or carry 20 pounds during
> basic work activities and frequently handle and carry up to 10 pounds. The
> claimant can occasionally perform postural adjustments, and pass around
> objects when work in a chair. She can only occasionally perform rapid and
> depth bending, squatting, and stooping. The claimant can remember prior
> learning, but is limited to learning simple instructions of no more than 3 to

> 4 steps. She needs a well-set routine, and works best with the presence of a supervisor. The claimant cannot engage in higher-level social interaction, such as being a project leader, but can have routine and perfunctory social interaction with supervisors, coworkers, and the retail public. In addition, claimant cannot work in a dangerous industrial setting.

(Tr. at 16-22, Finding No. 4). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 22-23, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 23-24, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1992 and was defined as a younger individual; (2) she had a limited education, but could communicate in English; and (3) transferability of job skills was not material to the disability determination, because the Medical-Vocational Rules supported a finding that the Claimant is "not disabled," regardless of her transferable job skills. (Tr. at 23, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 23-24, Finding No. 9). In particular, Claimant could work as a mail clerk, ticket seller, or racker/pool hall attendant at the light unskilled level. Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act. (Tr. at 24, Finding No. 10).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, she argues that the ALJ erred at the third step of the sequential process by failing to find Claimant disabled under listing 12.05C. (ECF No. 11 at 5-6). Claimant points out that she received valid IQ scores below 70 and had an additional severe impairment, yet the ALJ

6

disregarded that evidence when comparing Claimant's limitations to those contained in the Listing. Second, Claimant contends that the ALJ incorrectly weighed the medical source statement of Claimant's treating psychiatrist, Dr. Nika Razavipour. (*Id.* at 6-8). Dr. Razavipour opined that Claimant had marked limitations in her ability to interact with others, had marked limitations in responding appropriately to changes in the work setting, and would likely miss five or more days of work each month due to psychological symptoms. However, the ALJ gave these opinions minimal weight despite their consistency with other evidence of record and notwithstanding Dr. Razavipour's status as a treating physician. (*Id.*). Lastly, Claimant complains that the ALJ failed to properly consider the VE's opinion that Claimant was unable to work when taking into account the limitations found by Dr. Razavipour. (*Id.* at 8-9).

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision; therefore, it should be affirmed. With respect to Claimant's argument regarding listing 12.05C, the Commissioner contends that even if Claimant met the severity criteria outlined in paragraph C, she did not meet or equal the diagnostic description in the introductory paragraph of the listing. (ECF No. 12 at 10-14). Consequently, the ALJ reached the correct conclusion at step three. In addition, the Commissioner argues that the ALJ properly rejected Dr. Razavipour's opinions, because they were unsubstantiated and unsupported by the other evidence of record. (*Id.* at 14-17). Given the lack of proof to validate Dr. Razavipour's opinions, the Commissioner posits that the limitations expressed by Dr. Razavipour did not require incorporation into the hypothetical questions posed to the VE. The Commissioner suggests that the hypothetical questions contained all of the functional limitations substantiated by the record. Accordingly, the ALJ properly relied upon the VE's opinions regarding Claimant's

employability despite her impairments. (*Id.* at 17).

## V.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VI.   <u>Relevant Medical Records</u>

The court has reviewed the Transcript of Proceedings in its entirety, including the

medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A. Medical Records

On January 6, 1999, at the age of six, Claimant began treatment for behavioral issues at Marshall University School of Medicine, Department of Pediatrics. (Tr. at 250-51). According to her mother, Claimant was hyperactive and missed too many days of school due to illness. One week later, on January 12, 1999, Claimant saw Dr. James Lewis, of University Pediatrics, for a presumptive diagnosis of ADHD. (Tr. at 322). Claimant's mother informed Dr. Lewis that Claimant had exhibited problem behavior for a number of years, which had worsened when she started kindergarten and manifested in a lack of attention span and hyperactivity. Claimant had been successfully treated with medication in the past, but had recently stopped taking the medication. Claimant's mother described Claimant as having "fits" of screaming, kicking, and "carrying on" when she did not get her way. More than once, she had hit a physically handicapped aunt and fought with her uncle. Claimant's teacher also reported that Claimant was lagging behind the other children in her abilities and class work. (*Id.*).

Dr. Lewis examined Claimant, describing her as alert and cooperative. Dr. Lewis found Claimant to have positive criteria for ADHD in all elements, including inattentiveness, hyperactivity, and impulsivity, along with oppositional defiant behavior. Her temperament likewise was positive for the first three elements: regularity, persistence, and sensory threshold. Connor's questionnaires, which were completed by Claimant's parent and teachers, showed high positive results for hyperactivity, short attention span, and inattentiveness, with oppositional defiant aspects at home. Dr. Lewis felt Claimant required a team evaluation and strongly suggested that her mother seek

mental health services for Claimant at Prestera Centers for Mental Health ("Prestera").

Claimant returned to Dr. Lewis on February 9, 1999, with significant problems at home, primarily due to her behavior. (Tr. at 321). Claimant's teacher was also having issues with Claimant's attention span and concentration. According to Claimant's mother, Claimant was not responding to behavior modification techniques, describing prolonged temper tantrums. Dr. Lewis assessed Claimant with probable ADHD with descriptions of oppositional defiant disorder, although he noted that Claimant seemed "pretty cooperative at this point." (*Id.*). Dr. Lewis prescribed Ritalin and discussed with Claimant's mother the Prestera parenting program.

Claimant returned on March 2, 2000 with complaints by her mother and teacher that she had gotten worse. (Tr. at 320). At school, Claimant did not listen to the teacher or follow directions. At home, she smacked herself in the head and had screaming fits when she did not get her way. Since her last visit, Claimant's mother reported Claimant's hyperactivity, motor restlessness, impulse control, frustration tolerance, and family relations had gotten worse. There was no change in Claimant ability to finish tasks, her peer relations, attention span, or distractibility. Regarding behavioral issues, on a scale of 0 to 9 with 9 being the most serious, Claimant scored 9 on feeling sad and unhappy, prone to crying, and feeling anxious. She scored 8 for stomach aches, 6 for decreased appetite and headaches, and 3 for prolonged staring or daydreaming. Claimant was assessed with ADHD, headaches, and stomach pain. Dr. Lewis included Adderall to Claimant's medication regimen. (*Id.*).

Over a year later, on May 7, 2001, Claimant returned to Dr. Lewis. (Tr. at 318-19). At this time, Claimant was in the second grade and was being home-schooled due to her asthma, illnesses, and long absences from school. Dr. Lewis documented that home-

schooling was not successful as Claimant's behavior had gotten worse. According to her mother, Claimant would scream, hit, and throws things. Since her last visit in March 2000, Claimant had continued to take Adderall with a good response, although the addition of Ritalin had not helped to ease her symptoms. Claimant displayed problems with attention span, hyperactivity, and impulse control. Claimant was assessed with ADHD, primarily inattentive type, but with considerable behavioral problems. Claimant was prescribed Adderall 10 milligrams to be taken in the morning and early evening. In addition, Dr. Lewis discussed with Claimant's mother the urgent need to get Claimant into counseling. Dr. Lewis noted that Claimant's mother had been given the Prestera contact information a number of times in the past without her following up. At this visit, he stressed to her Claimant's need for counseling on behavior modification, as well as psychological and academic testing. Dr. Lewis opined that home schooling was not a good option for Claimant due to stresses at home and her problem with oppositional defiant behavior. (*Id.*).

Claimant returned to Dr. Lewis on June 7, 2001 doing very well with her medication. (Tr. at 316-17). Claimant's mother told Dr. Lewis she was impressed with her daughter's improvement, especially in her self-esteem, relationships with friends, and impulse control. Claimant's mother informed Dr. Lewis she was planning on home-schooling Claimant in the coming school year. A child behavior checklist completed by Claimant's mother was positive only for attention deficits and aggressive behavior problems. Claimant was assessed with ADHD, combined type, with a good response to medication. In addition, Dr. Lewis felt some of Claimant's oppositional defiant behavior issues were improving with medication. Claimant's Adderall was continued and her mother agreed to contact Prestera to arrange for counseling.

Claimant was seen again by Dr. Lewis on November 8, 2001, and at that time, she was in the third grade attending public school. (Tr. at 314-15). Claimant's mother was concerned that Claimant was becoming discouraged as she was not passing most of her classes. Claimant had been tested and was found to do fairly well with reading. Although her math scores were low, they were not low enough to require the school to provide special assistance. Claimant's medication was effective in the mornings; however, it was less so in the evening when Claimant was trying to do her homework. When Claimant became frustrated with her school work, she would hit herself in the head. Claimant's diagnoses remained unchanged, and Dr. Lewis noted that her current dosage of medication was providing inadequate results. He increased the dosage to help control Claimant's impulse problems relating to her schoolwork. Dr. Lewis informed Claimant's mother that even if the change in medication improved her symptoms, Claimant was still a candidate for psychological counseling. Dr. Lewis also stressed to Claimant's mother that she should request a Section 504 school plan for Claimant, which provided educational benefits to children with ADHD.

In November 2001, both Claimant's mother and her third grade teacher completed a parent and teacher progress report for review by Dr. Lewis. Using a scale of 0 to 3 with 0 being never, 1 being occasionally, 2 being often, and 3 being very often, Claimant's mother scored Claimant with a 3 in the categories of restless and overactive, excitable and impulsive, failure to finish things, inattentive and easily distracted, temper outbursts, fidgeting, disturbing other children, demands must be met immediately or easily frustrated, cries often and easily, quick and drastic mood changes, appetite loss, excitable and impulsive and grates teeth. Conversely, Claimant's teacher scored her at 0 in all those categories with the exception of the category of fails to finish things, in which she scored

a 1. (Tr. at 254-56). Claimant's mother indicated that Claimant's medication seemed to wear off by the afternoon, and she was not performing as well academically since she had moved to a new school. (Tr. at 314). Dr. Evans again discussed with Claimant's mother the need for psychological counseling and for a Section 504 school plan. (*Id.*).

Claimant returned to Dr. Lewis on March 7, 2002 with continuing problems involving schoolwork, especially math, and numerous absences from school due to illness and family issues. (Tr. at 312-13). Claimant had not been taking her medication, and, although she had participated in some counseling at Prestera in the past, she was no longer doing so. Claimant did not have a Section 504 school plan in place, but her mother did have a meeting scheduled with the school board. Claimant's mother reported that Claimant's problems with finishing tasks, frustration tolerance, irritability, hyperactivity, attention span, distractibility, impulse control, self-esteem, insomnia, feelings of sadness and anxiety had gotten worse. Dr. Lewis prescribed Adderall XR thirty milligrams, which he felt would aid Claimant in improving her schoolwork. (*Id.*).

Throughout 2002, Claimant returned to Dr. Lewis with continued problems at school. Claimant displayed impulsive behaviors, including lying, and was sad and anxious. She became angry throughout the school day and had trouble paying attention. Even so, her grades were generally good. Dr. Lewis reiterated that Claimant would benefit from psychological counseling and a Section 504 academic plan. (Tr. at 308-11). On May 16, 2002, Dr. Lewis commented that Claimant was in the top reading group; however, Claimant's mother reported her attention span, frustration, self-esteem, and relationships with friends had gotten worse. (Tr. at 310). At this visit, Dr. Lewis recorded that Claimant had a fairly good response to medication and her worsening problems were most likely due to the illness of her grandfather with its accompanying stress on the

family. On September 24, 2002, Claimant was in the fourth grade and having a difficult year, telling lies at school and showing little response to her medication. However, Claimant had received an A in math and was on the honor roll.  Her diagnosis remained unchanged. Dr. Lewis felt Claimant's problems were more closely related to issues at home and prescribed Adderall 30 XR along with Tenex. He also referred Claimant to Dr. Linz for counseling. (Tr. at 308).

The following year, Claimant continued to get good grades and made the honor roll. (Tr. at 304). In addition, she participated in several school activities, such as cheerleading, safety patrol, and fire patrol. Even so, Claimant continued to have problems at school with her behavior with other students and with adults. (Tr. at 304-06). Claimant had been hitting other children and lying at school. She was scheduled to see Dr. Linz for evaluation of her behavior, but that did not occur. Claimant's teacher felt that whenever Claimant was upset, she would make herself sick. Claimant had lost her medical card, so she was not taking the prescribed medication. Claimant reported headaches, anxiety, irritability, sleep issues, and occasional nightmares. Her mother was most concerned with Claimant's mood swings. Dr. Lewis restarted the medication and referred Claimant to Dr. Linz for counseling.

On September 21, 2004, Claimant returned to Dr. Lewis's office for follow-up. (Tr. at 300-02). She was twelve years old and in the sixth grade. She was adjusting to middle school, but continued to have problems at home. Dr. Lewis observed that he had not seen Claimant in over a year, and she had been "off and on" her medication for the past two months. Claimant reportedly was "throwing fits, screaming, throwing things and actually hitting herself" at home, with her worst issues involving attention span, distractibility, frustration tolerance, and irritability. In the past, Claimant's prescribed medication

seemed to help; especially, Adderall XR 30 and Tenex. At this visit, Dr. Lewis confirmed that in addition to sporadic medication compliance, Claimant had not been receiving the recommended counseling. Claimant was assessed with ADHD with inadequate treatment. Because Adderall XR 30 had proven beneficial in the past, Dr. Lewis prescribed it again for Claimant. He also provided questionnaires to her parent and teachers for use in assisting him to monitor and gauge Claimant's behaviors. As for her anxiety and depression, Dr. Lewis felt Claimant might have mood issues; however, he decided to re-evaluate this after she had a chance to restart her medication. To help with her mood, Dr. Lewis added Remeron to her medication regimen.

During this period, several of Claimant's teachers completed questionnaires supplied by University Pediatrics School Solution Center for review by Dr. Lewis. (Tr. at 323-46). Claimant's reading teacher found Claimant's overall academic performance and behavior as average. (Tr. at 323-25). The only issues she noted were that Claimant occasionally failed to give attention to details, made careless mistakes in her schoolwork, had difficulty sustaining attention to tasks or activities, following through on instructions, and failed to finish her schoolwork. Claimant occasionally appeared fearful, anxious or worried, self-conscious, easily embarrassed, and guilty. She blamed herself for the problems she encountered, and appeared sad, unhappy, or depressed. Claimant had average relationships with her peers, and was average in following directions and in organizational skills; however, Claimant had somewhat of a problem with assignment completion. Claimant's physical education teacher and choir teacher also rated her with average overall academic and behavioral performance. (Tr. at 338-43). In contrast, Claimant was failing science and language arts; was below average in academic performance in health and social studies; was below average in behavioral performance

in science; had difficulty paying attention; was described as disorganized; was argumentative and defiant at times; and was absent from school quite a lot. (Tr. at 326-31, 335-337, 344-46). Claimant's social studies teacher noted this class included a "co-teacher," allowing Claimant to get "more help." Claimant's math teacher could not complete the questionnaire at all as Claimant had been "absent for several weeks" and, therefore, the teacher could not make a "fair assessment." (Tr. at 344-46). Shortly thereafter, on October 12, 2004, Dr. Lewis wrote to Claimant's principal, advising him that Claimant had a diagnosis of ADHD and requesting his assistance in formulating a Section 504 school plan to help Claimant with her educational needs. (Tr. at 252-53). In particular, Dr. Lewis suggested accommodations, such as repeating and simplifying instructions, providing a structured work environment, supplementing verbal instructions with visual instructions, modifying testing delivery, selecting modified textbooks and workbooks, using tutors, utilizing positive and negative reinforcement, and providing supplementary materials. (*Id.*).

Claimant returned to Dr. Lewis twice in 2005. (Tr. at 294-99). On January 27, 2005, Claimant complained of having problems at school. She was not participating in class and was failing health, although her grades were borderline in English and science classes. Dr. Lewis noted that Claimant had a long history of emotional problems. He had repeatedly referred her for counseling, but without much effect. Dr. Lewis was also concerned that no Section 504 academic plan had ever been put into place despite his letters to the school. Dr. Lewis observed that Claimant had not had any educational testing. At home, where the most troubling behavior issues were occurring, Claimant had "screaming fits," threw things, and was very difficult to control. Claimant had gained a significant amount of weight and continued to have sleep, behavioral, and mood issues.

16

Dr. Lewis diagnosed Claimant with ADHD combined with inadequate response to treatment. He increased her Adderall dosage and decided to the request that Dr. Linz evaluate Claimant for her disruptive behaviors to determine if the cause was adolescent adjustments versus anxiety/depression versus bipolar disorder. (Tr. at 297).

On October 6, 2005, Claimant reported continued struggles at middle school. She was having considerable difficulty adjusting to a new school and was failing her classes. Claimant did not complete her schoolwork, or turn it in on time. At home, her behavior had not improved either. Claimant was being very defiant and disrespectful to her mother, and continued to throw "fits." (Tr. at 294). She also had trouble sleeping. Dr. Lewis felt Claimant's medications were not working as well as he had hoped. He was concerned with Claimant's depression and felt she needed regular counseling. He desisted Claimant's Clonidine prescription and gave her Remeron for sleep.

The following year, Claimant saw Dr. Lewis twice; in July and August 2006. (Tr. at 292-293). On July 4, 2006, Dr. Lewis documented that Claimant would be starting eighth grade in the fall, and although her grades were good, the medication did not appear to be working given that Claimant was "hateful, screams, and stays depressed." (Tr. at 293). She was seen at River Park Hospital earlier in the month for "cutting herself." Dr. Lewis felt that Claimant needed to see a psychologist. He added Zoloft to her medication regimen. The following month, on August 22, Claimant appeared happy and smiling and reported she was not having trouble sleeping. Dr. Lewis observed that Zoloft was helping ease her symptoms. (Tr. at 292).

Claimant returned to Dr. Lewis three times in 2007: February 16, May 3, and August 27. (Tr. at 283-91). In February, even though Claimant was making the honor roll and participating in the school choir, she continued to have considerable problems with

other students. In addition, Claimant was upset with family issues at home and reported that she felt like cutting herself. Dr. Lewis noted that Claimant was not receiving counseling and her prescribed medication seemed to wear off. Dr. Lewis increased Claimant's afternoon dose of Adderall. As for her behavior, Dr. Lewis was skeptical that Claimant's issues were caused by bipolar disorder in light of her success at school and positive reaction to Adderall. Instead, he felt that she suffered from anxiety and depression. (Tr. at 289). Dr. Lewis again urged Claimant to receive counseling, and advised her to go to the Emergency Department if she felt suicidal.

On May 3, 2007, Claimant's hyperactivity, attention span, impulse control, family and friend relationships had improved, but her frustration tolerance was worse. (Tr. at 286). Dr. Lewis noted that Claimant had been admitted to River Park Hospital three months earlier for bipolar disorder. (Tr. at 284). Claimant was experiencing depression and anxiety at school. She was seen by a social worker and started taking Zoloft; however, her mother discontinued the medication, because as she did not think it was effective. Claimant's mother also stopped Claimant's afternoon dose of Adderall, indicating that the medication interfered with Claimant's sleep. Dr. Lewis felt that 60 milligrams of Adderall was appropriate and noted Claimant was doing "quite well" in school carrying a 3.1 grade average. He felt that Claimant was "desperately in need of counseling," so he gave her a referral. (*Id.*) Dr. Lewis suggested Claimant might be able to take a test and move on to the ninth grade; however, Claimant was not sure she wished to do that.

On August 27, 2007, Claimant reported improvement in all categories of behavior. Her current medication offered a good response with no side effects, and her mother reported that Claimant had no school or behavior concerns. Claimant indicated she really liked school and was anxious to start the new year. (Tr. at 282).

In February 2008, Claimant returned to Dr. Lewis for follow-up. She was 15 years old and in the eighth grade. (Tr. at 279). Her mother reported that Claimant liked school and was showing good performance with homework and tests, although she did sometimes forget to study. (Tr. at 280-81). Claimant continued to be "mouthy" at home, but her teachers were complimentary of her behavior in class. (Tr. at 281). By September 3, 2008, Claimant had progressed to the ninth grade. She was having some side effects to her medication and still displayed occasional angry outbursts, anger and aggression. (Tr. at 276-78).

Claimant returned to Dr. Lewis once in  2009.  (Tr. at 272-75). On March 16, 2009, Claimant reported she did not like school. Her best subject was parenting and her worst subject was gym. She reported having "problems" with her gym teacher. (Tr. at 272). Claimant stated that she had no issues completing her assignments or studying, and her tests results were good. Dr. Lewis noted that Claimant's grade point average was 2.0 and she was having some issues with her classes and her teachers. (Tr. at 272). Claimant continued to complain of frequent headaches. On examination, Claimant was alert, and cooperative, with a euthymic mood and normal affect. Dr. Lewis renewed Claimant's prescription for Adderall. (Tr. at 274). He opined that Claimant's academic and behavioral problems were manageable, and her ADHD was responding fairly to the current medication. (*Id.*).

On March 23, 2010, Claimant returned to Dr. Lewis's office for follow-up. (Tr. at 267-70). She reported liking school, stating that her best subjects were math and biology and her worst subject was Spanish. She claimed to do well with homework, had fair study habits, and good organization. (Tr. at 267). Claimant described her home situation to be good and "improving," and her medication was effective. (*Id.*). Claimant complained of

severe headaches and mood issues. On examination, Claimant was alert with normal affect, euthymic mood, and cooperative attitude. She was assessed with headache; ADHD, combined type; and oppositional defiant disorder of childhood. Dr. Lewis opined that Claimant's academic and behavioral problems were manageable and her ADHD demonstrated excellent response to the current prescribed medication. (Tr. at 269).

Claimant returned to Dr. Lewis on October 5, 2010. (Tr. at 264-66). At this visit, Claimant reported that her medication, even though effective, caused her to feel "completely drained" and she had "no energy." (Tr. at 265). Claimant also told Dr. Lewis when she took her medication, it made her very angry and left her in a bad mood. She had frequent trouble sleeping and had occasional impulse control issues, frustration tolerance, irritability, stress, daydreams, and headaches. However, Claimant denied having problems with hyperactivity or attention span. (Tr. at 264-65). By this time, Claimant was in the eleventh grade and making "pretty good" grades. (Tr. at 265). Dr. Lewis decreased Claimant's Adderall dose to XR 50 milligrams and advised her to return in four months. (Tr. at 266).

On October 30, 2013, Claimant was seen by Cheryl Hinshaw at Prestera for a mental health assessment. (Tr. at 451-58, 466-75, 503-8). Claimant informed Ms. Hinshaw that during the application process for a medical card, Claimant was advised she had "really bad depression" and was referred to Prestera for an evaluation. (Tr. at 453). Claimant stated that Dr. Lewis, her family doctor, diagnosed her with ADD and ADHD at age 7, and with bipolar disorder and clinical depression at age 13. Dr. Lewis had prescribed for Claimant "the highest dose of Adderall you can get" and Zoloft; however, according to Claimant, she lost her medical card at age 18 so she stopped taking the medication.

Claimant described that whenever one of her mental health issues was exacerbated, then all of her mental health issues increased, causing her to be depressed and isolate herself from others. Claimant reported that the depression typically lasted for one to two days and would slowly improve. Claimant reported flare ups caused her to be irritable and agitated; sometime she could not stay still and would get easily distracted. (Tr. at 454). Claimant was admitted to River Park Hospital at age 12 because her mother could not control her and she was cutting herself. Claimant was removed from school in the eleventh grade as she was being bullied. Claimant worked as a kitchen aid in a nursing home for a month and a half, but was fired for serving peanut butter sandwiches on a ward where a patient had a peanut allergy.

On examination, Claimant appeared socially withdrawn and overwhelmed in coping ability; however, she was oriented to time, place, person and situation with an appropriate affect. She demonstrated normal thought content, motor activity and appropriate eye contact. (Tr. at 455-56). Claimant was getting inadequate sleep, which made her restless. Her appetite was good and she had no homicidal or suicidal ideations. Claimant was assessed with episodic mood disorder, NOS, rule out bipolar disorder; depressive disorder; and hyperkinetic syndrome, NOS. (Tr. at 457). Claimant received a GAF score of 55.[1]

Claimant returned to Prestera  on November 7, 2013, for a counseling session with

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

Jessica Hewitt, M.Ed. (Tr. at 459). Claimant appeared alert and fully oriented and reported mood swings, decreased energy and motivation, sadness, self-isolation, and sleep issues. Claimant described an extremely dysfunctional family life, which had existed for many years and caused her great stress. Claimant was advised to continue counseling sessions.

A few days later, on November 25, Claimant returned to Prestera for an assessment by an attending psychiatrist, Nika Razavipour, M.D. (Tr. at 461-65). Claimant complained of mood swings, along with a lack of focus; being unable to sit still; counting money repeatedly; having a hand washing and hair brushing ritual; and not sleeping well. On examination, Claimant appeared alert, cooperative, calm, and fully oriented. Her motor activity was within normal limits, as was her speech and eye contact. Claimant demonstrated an appropriate affect and euthymic mood. Claimant's immediate, remote, and recent memory was intact, as was her insight and judgment. Dr. Razavipour assessed Claimant with episodic mood disorder, NOS, and hyperkinetic syndrome based on Claimant's reported history of ADD and ADHD. Claimant received a GAF score of 55. Dr. Razavipour rated Claimant's prognosis as good. He provided her with a prescription for Zoloft, ordered lab tests, and advised Claimant to continue counseling with Ms. Hewitt.

Claimant returned for counseling on January 8, 2014 and February 7, 2014. (Tr. at 460, 510-11). Claimant continued to have family issues which caused her stress. On February 7, Claimant appeared alert and fully oriented. She told Ms. Hewitt her mood had been "ok" until she injured her knee and had to get an MRI. Although Claimant continued to have family issues, she reported she did "feel better." (Tr. at 460).

Dr. Razavipour evaluated Claimant on March 14, 2014. (Tr. at 490-93). She appeared cooperative and calm with normal eye contact and motor activity. Claimant's

mood was euthymic and her affect appropriate. Claimant demonstrated goal directed thought processes along with appropriate thought content. Claimant was assessed with episodic mood disorder, with the need to rule out depression as well as bipolar disorder, and hyperkinetic syndrome by history. Claimant retained a GAF score of 55. Dr. Razavipour prescribed Zoloft, 25 milligrams, and ordered from Dr. Lewis, Claimant's prior psychiatric testing results for ADD and/or bipolar disorder.

Claimant returned to Dr. Razavipour on May 2, 2014. Claimant reported she was getting along better with her mother although she continued to feel depressed. (Tr. at 494-97). She told Dr. Razavipour that her mood in the past used to "be real bad" and her "flipping out" at work caused her to get fired twice. Her examination remained unchanged from her visit in March as did her assessment and GAF score. Dr. Razavipour increased her Zoloft dosage to 50 milligrams.

On May 5, 2014, Claimant attended a counseling session with Ms. Hewitt. Claimant reported her mother and grandfather had recent health problems in addition to her friend who had terminal cancer and who had requested Claimant take over the care of her special needs one-year-old upon her death. (Tr. at 502). Claimant felt very stressed about her situation and mused she was not sure if she could handle a baby at this point in her life. She did tell Ms. Hewitt she was getting a tattoo that day which would make her "happy."

Claimant returned to Dr. Razavipour on May 12, 2014 reporting she was constantly upset and had to "get out and go for walks" to try and stave off being upset. (Tr. at 498-501). Claimant told Dr. Razavipour she had never before felt this bad. In addition, she was taking care of her mother who had previously had a stroke and suffered seizures. Claimant's examination results, assessment, and GAF score remained unchanged. In addition to Zoloft, Dr. Razavipour prescribed Lamictal, advising Claimant to return in one

month.

Claimant underwent counseling with Ms. Hewitt two days later on May 14, 2014. (Tr. at 476-85). Ms. Hewitt noted Claimant presented with mild symptoms of depression, distractibility, impulsivity, and poor concentration; while Claimant showed moderate symptoms of apathy, change in sleep patterns, and withdrawal. (Tr. at 480-81). Upon examination, Claimant's appearance, sociability, speech, thought content and recall memory were all within normal limits. Her affect was appropriate and she was found fully oriented; however, her coping skills appeared to be deficient. Ms. Hewitt observed that Claimant had not participated in any self-help groups within the past month. Claimant received a diagnosis of mood disorder, NOS. At this visit, Ms. Hewitt noted they were awaiting prior treatment records from Claimant's family physician in order to rule out possible diagnosis of ADHD and bipolar disorder. (Tr. at 476-77).

### B. Consultative Assessments and Other Opinions

On October 9, 2012, Brian P. Bailey, M.A., performed a consultative psychological evaluation of Claimant at the request of the West Virginia Social Security Disability Determination Section ("DDS"). (Tr. at 382-86). His assessment included a client interview, mental status examination, and the administration of the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and the Wide Range Achievement Test-4 ("WRAT-4").

During the interview, Claimant advised that she was applying for Social Security benefits due to "peptic ulcer disease, asthma, back pain, migraines, arthritis, ADD, ADHD, bipolar disorder, panic attacks, and clinical depression." (Tr. at 382). Claimant told Mr. Bailey that she was born and raised in Huntington, West Virginia and had been living with her step-grandfather until she and her mother could get an apartment together. Claimant had never been married and had no children.

Claimant reported having been diagnosed with ADD and ADHD at age seven for which she received medications that were was only slightly effective. She described a long history of difficulties with task persistence and of being easily distracted, although she denied any problems with organization, stating that she sometimes spent one to two hours a day "keeping her things organized." (Tr. at 383). Claimant reported having occasional panic attacks, frequent anxiety, and mood lability involving irritability and temper issues. Claimant indicated that her sleep pattern were restless with frequent initial insomnia. In addition, Claimant reported recurrent depression, sometimes two months in duration, loss of interest and bouts of anhedonia. Claimant stated that she had been diagnosed with bipolar disorder, without prominent symptoms of mania. She felt guilt over past family relationships and had difficulty making decisions.

When asked about her educational history, Claimant reported having been held back in the seventh grade and receiving remedial services related to math and possibly other subjects. (Tr. at 384). She believed she received average grades, however. Claimant had disciplinary problems due to excessive talking and ultimately quit school in the eleventh grade. While in school, she had minimal participation in extracurricular activities.

Claimant admitted that her employment history was limited. She first became employed at age eighteen, working in a fast food restaurant. She was fired approximately one month after starting, because she could not comprehend her job responsibilities and became "frustrated too easily." (*Id.*). She subsequently worked in the kitchen at an assisted living facility preparing food and washing dishes. However, she was fired from that job for similar reasons. Claimant reported that she "wasn't up to pace." (Tr. at 382, 384).

Mr. Bailey next administered the WAIS-IV and the WRAT-4. On the WAIS-IV, Claimant scored a 74 in verbal comprehension, 67 in perceptual reasoning, 69 in working memory, 81 in processing speed, with a full scale IQ measuring 67. Mr. Bailey found the test results to be valid, as both internal and external factors indicated validity. In addition, the results were consistent with Claimant's academic and vocational history. (Tr. at 384). The WRAT-4 results were 89 for word reading, 85 for sentence comprehension, 100 in spelling, 75 in math computation, and 85 in reading composite. (Tr. at 384-85). Mr. Bailey found these results were likewise valid. Claimant appeared to have no problem comprehending or complying with directions and no signs of sensory or psychomotor deficits.

Mr. Bailey performed a mental status examination, noting that Claimant was cooperative and showed no signs of disruptive behavior or prominent social discomfort. Claimant was quite talkative during the interview, but exhibited minimal humor. Mr. Bailey felt rapport was adequately established during the evaluation. Claimant was fully oriented and mildly anxious. Her affect was congruent with her mood, reflecting a normal range of expression. Claimant had normal thought content with circumstantial thought process. She exhibited fair insight along with average judgment. Claimant's immediate and remote memory was within normal limits and her recent memory appeared moderately deficient based on recall of words after a five-minute delay. Claimant's persistence and pace were also mildly deficient; however, her concentration was moderately deficient based upon the standard score on the digit span task. (Tr. at 385).

When asked about her daily activities and social functioning, Claimant reported minimal interest or involvement in social interaction. (*Id.*). She explained that she could not "find anybody I can get along with." (*Id.*). Mr. Bailey observed that Claimant had a

26

long history of interpersonal difficulties and/or estrangement from others. Claimant described a typical day for Mr. Bailey. She stated that she arose at noon or 1:00 p.m., took care of her personal needs, occasionally went out or took naps in the afternoon, and spent evenings at home. Claimant reported little participation in housekeeping, indicating that she vacuumed once per month, occasionally made a salad, and sometimes went to the grocery store to make small purchases for her step-grandfather.

Mr. Bailey assessed Claimant with major depressive disorder, recurrent, moderate; anxiety disorder, NOS, with panic attacks; and mild mental retardation. (*Id.*). Mr. Bailey explained that Claimant's diagnosis of mild mental retardation was based upon valid IQ scores in the range of mental retardation and Claimant's history of adaptive deficits involving academics, vocational functioning, self-care, home living, social/interpersonal skills, use of community resources, and self-direction. (Tr. at 386). He added that Claimant had exhibited intellectual and adaptive deficits since her developmental years. Mr. Bailey opined that Claimant had a guarded prognosis, and given to her intellectual deficits, would require assistance in managing any benefits she might receive. (Tr. at 385-86).

On October 26, 2012, Drew C. Apgar, J.D., D.O., performed an evaluation at the request of the DDS. (Tr. at 387-99). Claimant reported multiple medical problems including a left knee injury sustained three days prior to this evaluation, asthma and seasonal allergies, history of depression, bipolar disorder, ADHD, OCD, a learning disability, chronic back pain, headaches, and peptic ulcer disease. (Tr. at 388). On examination, Dr. Apgar found some decreased muscle strength in the lower left extremity related to a recent injury. Claimant's gait was unsteady, antalgic, deliberate and not fully weight-bearing and she required the use of crutches to ambulate. Claimant reported

27

feeling depressed which had been going on for years; although during the examination, she was observed to be friendly, cooperative and forthcoming.

Based upon his examination, Dr. Apgar opined that Claimant would have some issues with standing, walking, traveling, lifting, carrying, pushing, and pulling along with a possibility of some difficulty sitting. However, he found Claimant had no problems with handling objects with her dominant hand, hearing or speaking. He further found the outlined limitations might be related her the recent injury to her left leg. Consequently, Dr. Apgar felt that a future reassessment in several weeks to two months would help determine the expected duration of the limitations he detected at this examination. He further opined absent her recent leg injury, Claimant had no conspicuous functional limitations. Dr. Apgar noted Claimant gave considerable unsatisfactory effort and he therefore viewed the test results as unreliable. Claimant's mental status was deemed essentially normal. Claimant showed her understanding, long and short term memory were intact. Claimant maintained concentration and focus throughout the examination and she was able to show appropriate interaction and adaptation throughout the examination. Dr. Apgar opined Claimant would be capable of managing any benefits she might be awarded. (Tr. at 391-99).

On November 28, 2012, John Todd, Ph.D., completed a Psychiatric Review Technique. (Tr. at 70-71).  Dr. Todd reviewed the record under listings 12.04 (affective disorder) and 12.05 (mental retardation). Claimant was found to have mild limitations in maintaining social functioning and moderate limitations in maintaining activities of daily living as well as maintaining concentration, persistence and pace. Dr. Todd found no evidence of episodes of decompensation or the presence of the paragraph "C" criteria. Claimant was deemed to be mostly credible with no psychiatric treatment or medications.

Dr. Todd did not have any of Claimant's school records to review, but he noted Claimant quit school in the eleventh grade and received remedial services for math, but made average grades when in school. He also observed that Claimant had completed the forms for the evaluation on her own and demonstrated good spelling and writing that was inconsistent with the IQ scores showing mild mental retardation. Claimant was able to perform personal care, make simple meals, do laundry, walk, shop, pay her bills and watch television; however, she required reminders to take her medication.

Dr. Todd also completed a Mental Residual Functional Capacity Evaluation. (Tr. at 73-75). He opined that Claimant was not significantly limited in her ability to remember locations and work-like procedures or understand and remember very short and simple instructions; however, she was moderately limited in her ability to understand and remember detailed instructions. Dr. Todd concluded that Claimant was capable of performing simple, routine repetitive 2-3 step tasks with simple explanations and directions. (Tr. at 74). She was not significantly limited in her ability to carry out very short, simple instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions. However, Claimant was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Todd supported his findings with respect to Claimant's deficits in concentration and persistence by noting she required short, simple tasks in an environment with few distractions. Dr. Todd also found

29

that Claimant was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, or use public transportation; however, Claimant was moderately limited in her ability to respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. He based this conclusion on Claimant's need for a set routine with few changes. (Tr. at 75). On February 7, 2013, Philip E. Comer, Ph.D., reviewed Dr. Todd's findings and found no new medical records indicating more significant mental or emotional limitations than identified by Dr. Todd. Therefore, Dr. Comer affirmed the Mental Residual Functional Capacity Evaluation as written. (Tr. at 86-88).

On June 6, 2014, Nika Razavipour, M.D., completed a Mental Status Statement of Ability to do Work-Related Activities (Mental). (Tr. at 515-18). He diagnosed Claimant with mood disorder, NOS, rule out bipolar disorder and depression; and ADHD, NOS. He described her mental impairment and symptoms as severe, and indicated that Claimant's GAF score was 50.[2] Dr. Razavipour found Claimant had marked limitation in carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with the public, supervisors and co-workers, responding appropriately to usual work situations and a change in the routine of a work setting. As to symptoms, Claimant had marked symptoms in impulse control, mood disturbance, difficulty in thinking or concentrating, persistent disturbances in mood or affect, easily distracted and sleep disturbances. Dr. Razavipour felt the outlined symptoms would cause Claimant to miss work five or more days a month. Dr. Razavipour did not answer the question on the form as to whether Claimant could manage benefits in her own interest.

---

[2] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

## VII.   **Discussion**

Claimant's first challenge to the Commissioner's decision focuses on the ALJ's step three determination. Claimant contends that her impairments, in combination, met the severity criteria of listing 12.05C. Nevertheless, the ALJ failed to consider the evidence supporting a disability finding and, instead, rejected it without good reason.

Having reviewed the evidence and the ALJ's written decision, the undersigned agrees that the ALJ's step three analysis is lacking such that remand is required. *See Radford v. Colvin,* 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling."). Although the ALJ's determination may prove to be correct upon further review, the ALJ did not consider listing 12.05C or provide any focused analysis of that listing, despite significant evidence triggering the need for such an analysis. In her brief, the Commissioner urges the court to examine the evidence, arguing that Claimant is unable to establish the first prong of listing 12.05C; therefore, remand is unnecessary. However,  as the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") emphasized in *Fox v. Colvin,* it is not "the province of the district court [] to engage in these [fact-finding] exercises in the first instance." *Id.,* 632 F.App'x 750, 754 (4th Cir. 2015) (quoting *Radford,* 734 F.3d at 296). To the contrary, the ALJ should have completed the analysis that the Commissioner now asks the court to perform. Consequently, this case must be remanded to the Commissioner for a proper consideration of listing 12.05C.

At the second step of the disability determination process, the ALJ found that Claimant had the severe mental impairments of affective disorder and anxiety disorder, NOS. (Tr. at 14). However, despite Claimant's valid IQ scores below 70, the ALJ did not find Claimant to have a severe intellectual disability, nor did the ALJ provide any

31

discussion regarding Claimant's medically determinable impairment of mild mental retardation, established by diagnosis and testing, or the severity of that condition. (*Id.*).

The ALJ compounded this error at the next step of the process when he considered listings 12.04 and 12.06, but failed to compare the evidence of Claimant's intellectual disability to the criteria of listing 12.05. (Tr. at 15-16). Notably, the Commissioner does not argue that the ALJ had no duty to consider listing 12.05. Indeed, the Commissioner concedes that Claimant met two out of three prongs of that listing. Instead, the Commissioner contends that Claimant clearly does not meet the first prong of the listing; thereby, obviating the need to remand the decision for further proceedings.

At the third step of the sequential evaluation process, "an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met. ... The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390–91 (D. Md. 2000) (citations omitted); *see, also, Beckman v. Apfel,* No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) ("In cases where this is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing.") (citation omitted). The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set

at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to mental disorders, including listing 12.05— Intellectual Disability (formerly Mental Retardation). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* As such, to qualify for disability under listing 12.05C, a claimant must establish that she has an intellectual impairment that satisfies both the diagnostic description and the severity criteria outlined in paragraph C. The diagnostic description of intellectual disability, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria contained in paragraph C, which constitute the second and third prongs of the listing, are: "A valid verbal, performance, or full scale IQ of 60 through 70 **and** a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at § 12.05C.

Here, as the Commissioner acknowledges, Claimant produced evidence sufficient to trigger a comparison of her impairments against the criteria of listing 12.05C. First, Claimant submitted valid IQ scores between 60 and 70. When tested in 2012, Claimant obtained scores on the WAIS-IV of 67 in perceptual reasoning, 69 in working memory, and received a full-scale IQ score of 67. The scores were determined to be valid by Brian Bailey, M.A., the psychologist administering the test, on the basis that both internal and external factors indicated validity, and the results were consistent with Claimant's academic and vocational history. (Tr. at 384).

Next, Claimant produced undisputed evidence of a separate physical or mental impairment imposing a significant work-related functional limitation. The ALJ found that Claimant had several severe impairments, which prevented her from performing past relevant work. According to the Fourth Circuit, if a claimant has an additional impairment that qualifies as "severe," then that impairment should also be considered as imposing a significant work-related limitation under listing 12.05C. *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989). Similarly, if a claimant is precluded from performing past relevant work, she has established a work-related limitation of function which meets the requirements of § 12.05C. *Branham v. Heckler,* 775 F.2d 1271, 1273 (4th Cir. 1985). As the Fourth Circuit explains in these cases, "the additional limitation 'need not be disabling in and of itself.'" *Luckey,* 890 F.2d at 669 (quoting *Branham,* 775 F.2d at 1273).

With respect to the remaining prong of the listing—prong one: the diagnostic definition—there can be no dispute that any adaptive deficit displayed by Claimant manifested during her developmental period given that Claimant was 21 years old at the time of the ALJ's decision. Consequently, the question is whether Claimant's alleged

34

adaptive deficits rose to the level of severity required to meet or equal the listing. "'[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age ...." *Heaton v. Colvin*, No. CV 0:15-1150-TLW-PJG, 2016 WL 5109191, at *4 (D.S.C. Apr. 21, 2016), *report and recommendation adopted,* No. 0:15-CV-1150-TLW, 2016 WL 4993399 (D.S.C. Sept. 19, 2016) (quoting the Program Operations Manual System ("POMS") § DI 24515.056(D)(2)). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue,* 467 F.App'x 214, 218 (citing *Atkins v. Virginia,* 536 U.S. 304, 309 n. 3 (2002)). While intellectual functioning is measured by standardized IQ testing, "[a]daptive functioning refers to how effectively an individual copes with common life demands and how well [she] meets the standards of personal independence expected of someone in [her] particular age group, sociocultural background, and community setting." *See Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *2 (W.D.N.C. May 23, 2012) (quoting *Caldwell v. Astrue,* 2011 WL 4945959, *3 (W.D.N.C. October 18, 2011)).

Although listing 12.05C requires "'deficits' in adaptive functioning, it does not specify what degree of deficit is required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue,* 690 F.Supp.2d 464, 477 (W.D.Tex.2010) (citing *Barnes v. Barnhart,* 116 Fed.Appx. 934, 939 (10th Cir.2004)). Instead, "[w]hether a claimant's alleged deficits satisfy prong one is a fact-specific inquiry and must be determined on a case-by-case

basis." *Goble v. Colvin*, No. 7:15-CV-00049-RN, 2016 WL 3198246, at *5 (E.D.N.C. June 8, 2016) (citing *Richardson v. Colvin*, No. 8:12-cv-03507, 2014 WL 793069, at *11 (D.S.C. Feb. 25, 2014)). Thus, the weight given by the ALJ to each discrete piece of evidence reflecting Claimant's adaptive functioning is key to the step three analysis of listing 12.05. *See Salmons*, 2012 WL 1884485, at *7; *also Norris v. Astrue,* No. 7:07-CV-184-FL, 2008 WL 4911794, *3 (E.D.N.C. Nov. 14, 2008) (holding that a diagnosis of mental retardation is possible with IQ scores between 70 and 75 if there are significant deficits in adaptive behavior; however, the diagnosis may not be supported even with IQ scores below 70 if there are no significant deficits).

In that regard, Claimant supplied evidence of longstanding learning and behavioral difficulties dating back to elementary school, which prompted her mother to seek medical care for Claimant. Claimant's pediatrician, Dr. Lewis, repeatedly recommended to Claimant's teachers and principals that they implement a Section 504 educational plan to address Claimant's academic and attention deficits. Furthermore, Claimant reportedly required special education assistance with some of her classroom work, was held back in the seventh grade, and dropped out of school in the 11th grade, with a grade point average of 1.2. (Tr. at 37). Claimant never obtained a GED and was unable to pass the test for a driver's license. *See Rivers v. Astrue,* No. 8:10-cv-00314-RMG, 2011 WL 2581447, *3 (D.S.C. Jun. 28, 2011) (holding that substantial evidence of deficits of adaptive functioning were demonstrated where the claimant required a special needs classification at school, was repeatedly evaluated during her early years of education, was described as "inattentive with marked aggressiveness and speech defect," and dropped out of school). While poor grades and special educational courses alone do not establish the diagnosis of mental retardation, *Henry v. Colvin,* No. 3:13-cv-357, 2014

WL 856358, at *10 (E.D.Va. Mar. 4, 2014), difficulties in school can be a key indicator of early deficits in adaptive functioning. *Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22."). In addition to her academic deficiencies, Claimant had never lived alone and depended upon her extended family to clean, shop, cook, and care for her. *Id.* at *4. Claimant's psychological treatment records documented social and interpersonal deficiencies and an inability to maintain employment. *Luckey,* 890 F.2d at 669 (holding that work history, while not dispositive, was relevant to the determination of whether a claimant had significant deficits of adaptive functioning).

Notwithstanding the above-stated evidence, the court recognizes that there is conflicting evidence regarding the level of Claimant's general intellectual functioning and the severity of her deficits in adaptive functioning. For that very reason, the ALJ should have identified the evidence pertinent to listing 12.05C, analyzed it, determined the importance of each piece of conflicting evidence, and resolved the conflicts. *Hancock,* 667 F.3d at 476. The ALJ then had the duty to provide a reasonable explanation for why Claimant's impairments did or did not meet or equal the requirements of listing 12.05C. A review of the written decision demonstrates that the ALJ wholly failed to conduct a 12.05C analysis. Indeed, the ALJ never even mentioned the specific results of Claimant's IQ testing or addressed their validity. He also never explicitly discussed the severity level of Claimant's deficits in adaptive functioning based upon all of the relevant evidence. The ALJ's decision to reject Mr. Bailey's opinions during the assessment of Claimant's RFC simply did not overcome the ALJ's failure to consider listing 12.05C at the third step of the process. *See, e.g., Leslie v. Colvin*, No. 2:15-CV-0286-VEH, 2016 WL 3906430, at *4– 8 (N.D. Ala. July 19, 2016) ("Though [the ALJ] later gives little weight to Dr. Saxon's

opinions ..., that discounting is in regard to the RFC analysis in step four, not as applied to the I.Q. test. ... The fact that evidence potentially exists in the record that could sustain a decision to reject Mr. Leslie's I.Q. result is not sufficient if the evidence is never discussed by the ALJ.")

Therefore, for the foregoing reasons, the undersigned finds that the written decision does not reflect a clear and thorough analysis at step three of the disability determination process; specifically, as to the issue of whether Claimant's impairments met or equaled listing 12.05C. For that reason, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and must be reversed and remanded for consideration of Claimant's impairments under listing 12.05C.

Given that the Commissioner's decision will be reversed and remanded on this ground, the court need not address Claimant's other challenges. However, in the course of analyzing the severity of Claimant's intellectual disability, the Commissioner should reconsider all evidence, including the medical source opinions, relevant to Claimant's general intellectual functioning and deficits in adaptive functioning.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, the court **GRANTS** Plaintiff's motion for judgment on the pleadings, to the extent that it requests remand, (ECF No. 11); **DENIES** Defendant's request that the Commissioner's decision be affirmed, (ECF No. 12); **REVERSES** the final decision of the Commissioner; **REMANDS** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion; and **DISMISSES** this action from the docket of the Court. A Judgment Order shall be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:**  January 11, 2017

Cheryl A. Eifert
United States Magistrate Judge